# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

TINGZI WANG,

       *Plaintiff*,

    v.

UNITED STATES CITIZENSHIP AND
IMMIGRATION SERVICES *et al.*,

       *Defendants*.

Civil Action No. 16-1965 (TJK)

## <u>MEMORANDUM OPINION</u>

Plaintiff Tingzi Wang, a Chinese national, sought a visa for entry into the United States through the EB-5 Immigrant Investor Program, which grants legal resident status to qualified foreign nationals that invest capital in a new commercial enterprise. Wang applied for the visa based on his million-dollar investment in a Florida restaurant, for which he received an equity stake. Wang claimed that his investment was fully "at risk" as required by the EB-5 regulations. However, the United States Customs and Immigration Services (USCIS) denied his petition because his investment agreement included a guarantee that the other restaurant owners would purchase his stake whenever he wished to end his investment, thereby returning a portion of his capital to him. This sell option, USCIS concluded, eroded his capital contribution below the minimum amount required to be "at risk." This case is about whether USCIS reached that determination lawfully. Before the Court are the parties' cross-motions for summary judgment. For the reasons explained below, the Court will grant Defendants' Amended Cross-Motion for

Summary Judgment, ECF No. 26, and deny Wang's Amended Motion for Summary Judgment, ECF No. 25.[1]

## I.    Background

### A.    The EB-5 Immigrant Investor Program

In 1990, the Immigration and Nationality Act (INA) established the EB-5 Immigrant Investor Program, which provides visas to aspiring immigrants who make qualifying investments in U.S. commercial projects.  8 U.S.C. § 1153(b)(5).  To qualify for an EB-5 visa, an individual must invest at least $1,000,000 of capital into a new, restructured, or expanded business or commercial project in the United States and that investment must create at least ten full-time jobs for U.S. workers.[2]  *Id.*  Once the individual, or "petitioner," makes the required capital investment, she may submit a Form I-526 petition to USCIS to obtain status as a legal U.S. resident, along with her spouse and children, on a conditional basis for two years.  8 C.F.R. § 204.6(a).  After two years, a petitioner seeking permanent resident status may submit a Form I-829 petition to USCIS to show that she has satisfied all capital investment and job-creation requirements of the program.  *See* 8 C.F.R. § 216.6(c).  If a petitioner fails to meet these

---

[1] In reaching its conclusion, the Court considered all relevant filings including, but not limited to, the following: Plaintiff's Complaint, ECF No. 1 ("Compl."); Plaintiff's Amended Complaint, ECF No. 16 ("Am. Compl."); Joint Appendix, ECF No. 23-2 (with citations designated as "JA __"); Plaintiff's Amended Motion for Summary Judgment, ECF No. 25 at 1–2; Plaintiff's Amended Memorandum in Support of his Motion for Summary Judgment, ECF No. 25 at 3–50 ("Pl.'s MSJ Br."); Defendants' Amended Cross-Motion for Summary Judgment, ECF No. 26; Defendants' Amended Memorandum in Support of their Cross-Motion for Summary Judgment and Opposition to Plaintiff's Motion, ECF No. 24 ("Dfs.' MSJ Br."); Plaintiff's Opposition to Defendants' Cross-Motion for Summary Judgment and Reply in Support of his Motion, ECF No. 27 ("Pl.'s Opp."); Defendants' Reply in Support of their Motion for Summary Judgment, ECF No. 29; Plaintiff's Notice of Supplemental Authority, ECF No. 30 ("Pl.'s Notice"); and Defendants' Notice of Supplemental Authority, ECF No 31.

[2] Alternatively, an immigrant may qualify by investing $500,000 in a project in "a targeted employment area," defined as "a rural area which has experienced high unemployment." 8 U.S.C. § 1153(b)(5)(B).

requirements, or neglects to file an I-829 petition, USCIS must terminate the petitioner's conditional immigrant visa. *See* 8 U.S.C. § 1186b(b)(1); 8 C.F.R. §§ 216.6(a)(5), 216.6(d)(2).

The EB-5 program imposes specific requirements, through regulations promulgated by the Department of Homeland Security (DHS), about how, and under what conditions, petitioners must invest their capital to qualify for a conditional visa. Under those regulations, a petitioner must place "the required amount of capital at risk for the purpose of generating a return." 8 C.F.R. § 204.6(j)(2). To be "at risk," the petitioner must "show actual commitment of capital." *Id.* "Evidence of mere intent to invest, or of prospective investment arrangements entailing no present commitment, will not suffice to show that the petitioner is actively in the process of investing." *Id.* And any capital contribution cannot be made "in exchange for a note, bond, convertible debt, obligation, or any other debt arrangement." 8 C.F.R. § 204.6(e).

Under DHS regulations, a petitioner for an immigration benefit "must establish that he or she is eligible for the requested benefit at the time of filing the benefit request and must continue to be through adjudication." 8 C.F.R. § 103.2(b)(1). Any additional evidence submitted in connection with a benefit request at a later date, including evidence responding to a request from USCIS, must also establish a petitioner's "eligibility at the time the benefit request was filed." 8 C.F.R. § 103.2(b)(12). Under this rule, USCIS will deny a petition if the petitioner becomes eligible only after the petition was filed. *Id.*

USCIS may designate certain decisions issued by the Board of Immigration Appeals (BIA) as "precedent decisions" that are binding in future proceedings. 8 C.F.R. § 103.3(c). The BIA has designated four such decisions relating to USCIS adjudications of petitions under the EB-5 program. Relevant here is the BIA's decision in *Matter of Izummi*, 22 I. & N. Dec. 169 (BIA 1998). In that decision, the BIA held that an investment made to support an I-526 petition

"cannot be said to be at risk" if it was "guaranteed to be returned, regardless of the success or failure of the business."  22 I. & N. Dec. at 184.  Further, in that decision, the BIA held that a petitioner "may not make material changes to a petition that has already been filed in an effort to make an apparently deficient petition conform to Service requirements."  *Id.* at 175.

### B.     Wang's Petition for an EB-5 Visa

In June 2014, Wang filed an I-526 petition for EB-5 visas for himself and his wife, daughter, and son—all of whom, like Wang, are Chinese nationals.  JA 4.  Wang asserted his eligibility under the EB-5 program based on his $1,000,000 investment in Boca Restaurant, Inc., d/b/a Community Table ("Boca Restaurant" or "the Corporation"), a restaurant in Boca Raton, Florida.  JA 5–7.  The month beforehand, Wang had completed his investment by transferring $1,000,000 in cash to Boca Restaurant's operating account.  *Id.*  According to Wang's petition, his capital investment in Boca Restaurant created 18 new jobs for U.S. workers.  JA 3.  Wang also submitted an executed shareholder's agreement (the "Agreement") as part of his petition, dated February 28, 2014, that governed the terms of his investment.  JA 20–30.  In exchange for his capital investment, as set forth in the Agreement, Wang received equity shares in Boca Restaurant worth 40% of the company.  JA 20.

Section 6.01 of the Agreement, titled "Transfer of Shares," contained the terms by which investor-shareholders could transfer their shares to Boca Restaurant.  JA 23.  Under that section, "the Corporation shall purchase and the Shareholder or his or her estate shall sell to the Corporation, at the price set forth in Section 6.11, all of the shares in the Corporation legally or beneficially owned by the Shareholder" upon the occurrence of any of these events:

> (a) the death of a Shareholder,
> (b) the termination of [a] Shareholder's employment with the
>     Corporation, or
> (c) the voluntary retirement of a Shareholder . . . .

*Id.* Section 6.11 of the Agreement defined the purchase price "to be paid for the interest of a Shareholder":

> The value of each share of stock in the Corporation shall be equal to its book value plus an amount equal to (1) 70 percent of the accounts of the Corporation as of the end of the most recently completed fiscal quarter that precedes the event causing the sale of the shares, divided by (2) the number of outstanding shares of the Corporation as of the Purchase Date."

JA 26. Section 6.13 of the Agreement further defined the term "book value" as "the value of the capital stock of the Corporation as of the valuation date." JA 27. And under the Agreement, this value is calculated as follows:

> "[B]ook value" shall be defined to be the value of the stock of the Corporation after deducting the sum of all the liabilities of the Corporation from the sum of all the assets and property of the Corporation as shown on the books of the Corporation, except that the capital stock of the Corporation shall not be deducted as a liability, nor shall any surplus or undivided profits or any reserve fund representing the surplus or undivided profits be deducted.

*Id.*[3] Upon the event of a sale under Section 6.01, the "book value" of the shares sold is calculated "30 days after the date of the event precipitating the sale." *Id.*

In October 2015, USCIS responded to Wang's I-526 petition by sending him a Request for Evidence (RFE), which noted that he had "not established that [he was] eligible" for a temporary EB-5 visa and asked him to submit additional evidence to remedy "deficiencies in the existing record." JA 79–84. Specifically, USCIS alleged, Wang had not established that his investment capital was "at risk for the purpose of generating a return in accordance with

---

[3] Although the Agreement also notes that the definition of "book value" excludes accounts receivable when totaling the Corporation's assets, a prorated share of the Corporation's accounts is incorporated into the purchase price of any transaction under Section 6.01. JA 26.

applicable law."[4]  JA 82.  Because Sections 6.01 and 6.11 of the Agreement provided Wang "the option to withdraw and/or sell back his shares at any time he desires and receive all or a portion of his investment capital in return," the RFE stated, "there appear[ed] to be a guaranteed return agreement and a lack of risk."  *Id.*  To remedy this deficiency, the RFE permitted Wang to submit additional evidence to show that the Agreement "does not have a guaranteed return of capital that erodes [Wang's] capital contribution below the minimum amount."  JA 83.

A few months later, Wang responded to the RFE in part by submitting an amended shareholder agreement (the "Amended Agreement"), with the following provision added:

> Notwithstanding any provision of the Agreement to the contrary, this Amendment shall hereby amend all provisions contained in Section 6 of the Agreement with respect to the right of Wang to transfer his shares in the Company.  In compliance with the legal and policy requirements of the United States Citizenship and Immigration Services' EB-5 Immigrant Investment Program, Wang cannot sell, transfer or assign, in any manner, all or any part of his shares in the Company, prior to receiving final adjudication of his Form I-829 Immigrant Petition for Entrepreneur . . . including but not limited to his premature death or disability. Further, neither the Company nor any Shareholder can acquire the shares of Wang until such time as Wang has received final I-829 Petition adjudication.

JA 94.  Wang stated in his response that his capital investment was "100% at risk" under the original terms of the agreement because it "never intended to guarantee a return to investors." JA 86.  All the same, Wang informed USCIS that the shareholders amended the Agreement "in order to conform to the [EB-5] program requirements that [Wang] shall not [] sell shares or withdraw from the company prior to receiving final adjudication of Form I-829."  JA 85–86. The Amended Agreement, according to Wang, was "not inconsistent" with the original terms of

---

[4] The RFE cited another deficiency related to whether Wang had established that his investment capital was "obtained through lawful means," JA 83, but USCIS later confirmed that Wang satisfied this requirement by submitting supplemental documentation, *see* JA 322–23.

the Agreement and "d[id] not materially change" the Agreement. *Id.* Although Wang asserted

that it was "the understanding among shareholders/partners" that he would not "withdraw from

the company prior to receiving final adjudication of [his] Form I-829 [petition]," he admitted in

his response that this point was not "adequately addressed" by the original Agreement. *Id.* And

he also asserted that Section 6 of the Agreement did not guarantee "all or part of" his "return on

investment" because "the company ha[d] an obligation to purchase the shares at a fair market

value" and "[m]arket value is dependent on the performance of the business at the time of

transfer." *Id.*

On January 14, 2016, USCIS denied Wang's I-526 petition. JA 322–26. USCIS

determined that Wang's capital investment was not "at risk" as required by 8 C.F.R.

§ 204.6(j)(2) because Section 6.01 of the Agreement guaranteed "a return of capital." *Id.* In so

finding, USCIS declined to consider the additional provision added to the Amended Agreement

because, according to USCIS, it constituted a "material change" to his petition. JA 325. "Even

if USCIS accepted the amendment as a non-material change," USCIS stated in the denial, "the

purchase of shares by the company, per Section 6.11, is at 'book value,' and not 'fair market

value.'" *Id.* As a result, USCIS concluded that Wang "made the investment with the knowledge

that his shares will be worth the same amount for the life of the investment regardless of when he

intends to sell them." *Id.* For these reasons, USCIS determined that Wang "failed to establish by

a preponderance of the evidence that the Form I-526 complies with applicable legal

requirements." *Id.* In accordance with 8 C.F.R. § 103.5, USCIS offered Wang the opportunity

to appeal that decision and provide "additional evidence that shows [its] decision is incorrect."

*Id.*

On February 15, 2016, Wang appealed USCIS's denial. JA 327–28. Wang argued that USCIS was "incorrect" when it stated that he had "made an investment with knowledge that his shares will be worth the same amount for the life of the investment." JA 345. Unlike "the facts under *Matter of Izzumi*," on which USCIS relied, Wang argued that Section 6.01 was a "permissible redemption agreement" that only allowed him to redeem his shares based on their "book value," which "depends completely on the performance of the company." JA 341–43. He also argued that the Amended Agreement did not constitute a material change to his petition because the new provision reflected a "mutual understanding" between the shareholders and "clarif[ied] the concerns [USCIS] raised." JA 346.

On July 15, 2016, USCIS dismissed Wang's appeal and affirmed its denial of his I-526 petition. JA 387–92. USCIS acknowledged Wang's argument that it erroneously concluded that he "made the investment with the knowledge that his shares will be worth the same amount for the life of the investment," but affirmed that he "still [had] not demonstrated that the required minimum amount of capital was placed at risk for the purpose of generating a return in accordance with applicable law." JA 390–91.

### C. This Action

Wang filed this lawsuit challenging USCIS's denial of his I-526 petition on October 3, 2016. Compl. He then amended his complaint on March 3, 2017. Am. Compl. He brings three claims under the Administrative Procedure Act (APA) and one claim under the Due Process Clause of the Fifth Amendment. First, under 5 U.S.C. § 706(2)(A) of the Administrative Procedure Act (APA), Wang alleges that USCIS acted arbitrarily and capriciously by denying his petition purportedly because his investment was not "at risk" under EB-5 regulations and declining to consider his Amended Agreement when reaching that determination. *Id.* ¶¶ 34–78. Second, under § 706(2)(C), he alleges that USCIS exceeded its statutory authority and engaged

in *ultra vires* action when it denied his petition.  *Id.* ¶¶ 79–84.  Third, he contends that USCIS

violated his procedural due process rights under the Fifth Amendment by failing to consider

evidence that purportedly undermined the basis for its denial.  *Id.* ¶¶ 85–89.  Fourth, he asserts

that USCIS invoked a "rule of general applicability" by relying on a new legal standard but

failed to undergo the required notice-and-comment rulemaking for such rules.  *Id.* ¶¶ 90–93.

## II.    Legal Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, a court "shall grant summary

judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law."  However, when reviewing an agency action,

"the standard set forth in Rule 56[] does not apply because of the limited role of a court in

reviewing the administrative record."  *Hisgen v. Fanning*, 208 F. Supp. 3d 186, 192 (D.D.C.

2016) (citing *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 89 (D.D.C. 2006)).  In APA cases,

courts look to "whether an agency action is supported by the administrative record and consistent

with the APA standard of review."  *Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 41

(D.D.C. 2008).  Under this standard, courts must set aside agency action that is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with the law."  5 U.S.C. §

706(2)(A).  A court's review of an agency action under the arbitrary and capricious standard is

"[h]ighly deferential" and "permits reversal 'only if the agency's decision is not supported by

substantial evidence, or the agency has made a clear error in judgment.'"  *Hagelin v. FCC*, 411

F.3d 237, 242 (D.C. Cir. 2005) (quoting *AT&T Corp. v. FCC*, 220 F.3d 607, 616 (D.C. Cir.

2000)).  Courts "generally defer to the wisdom of the agency as long as the action is supported

by 'reasoned decisionmaking.'"  *Bean v. Perdue*, No. 17-cv-0140 (RC), 2017 WL 4005603, at *5

(D.D.C. Sept. 11, 2017) (quoting *Fox v. Clinton*, 684 F.3d 67, 75 (D.C. Cir. 2012).

## III. Analysis

The Court finds that Defendants are entitled to summary judgment on all counts. In Count I, Wang asserts that USCIS's denial of his petition and refusal to consider the Amended Agreement was arbitrary and capricious. But as explained below, he fails to show how USCIS's application of the relevant regulations and *Matter of Izummi* to his petition were unlawful on that basis. For similar reasons, summary judgment is appropriate for Defendants on Wang's allegations in Count II that USCIS engaged in *ultra vires* agency action, and in Count IV that USCIS applied a new rule to his petition without undertaking notice-and-comment rulemaking. Finally, Defendants are also entitled to summary judgment on Wang's Fifth Amendment due process claim in Count III, because he has no protected liberty or property interest in his visa application or the procedures through which it is processed.

### A. Whether USCIS's Denial of Wang's Petition Was Arbitrary and Capricious (Count I)

Under the arbitrary and capricious standard, a court "will not disturb the decision of an agency that has 'examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *MD Pharm. v. Drug Enforcement Admin.*, 133 F.3d 8, 16 (D.C. Cir. 1998) (quoting *Motor Vehicle Mfrs. Ass'n. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)). "To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Under this standard, an agency cannot "'offer[] an explanation for its decision that runs counter to the evidence' before it." *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 57 (D.C. Cir. 2015) (quoting *State Farm*, 463 U.S. at 43). However, "a decision of less than ideal clarity" must still be upheld "so long as 'the agency's

path may reasonably be discerned.'" *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 652 (D.C. Cir. 2016) (quoting *State Farm*, 463 U.S. at 43). And further, "[i]t is well understood in administrative law that a reviewing court will uphold an agency action resting on several independent grounds if any of those grounds validly supports the result." *Pierce v. SEC*, 786 F.3d 1027, 1034 (D.C. Cir. 2015) (citing *Carnegie Natural Gas Co. v. FERC*, 968 F.2d 1291, 1294 (D.C. Cir. 1992)).

In alleging that USCIS acted arbitrarily and capriciously when it denied his I-526 petition, Wang takes issue with two aspects of its decision. First, he argues that USCIS wrongfully determined that his investment was not "at risk" under EB-5 regulations. *See* Pl.'s MSJ Br. at 12–22. In doing so, he asserts that USCIS misinterpreted *Matter of Izummi* and misunderstood the term "book value" under the Agreement. Second, Wang argues that USCIS improperly concluded that his Amended Agreement was a "material change" to his original petition. *See id.* at 24–31. The Court considers each in turn.

### 1. The "At Risk" Determination

USCIS denied Wang's I-526 petition because it determined that his investment was not sufficiently "at risk" under EB-5 regulations. JA 324. In doing so, USCIS relied on *Matter of Izummi*, which, according to its explanation in the denial letter, established that if a petitioner "is guaranteed the return of a portion of his or her investment, . . . then the amount of such guaranteed return is not at risk." *Id.* (citing 22 I. & N. Dec. at 180–84). Under that precedent, as USCIS explained to Wang in the RFE, it determined that Wang's investment was not "at risk" because Section 6.01 of the Agreement provided him "the option to withdraw and/or sell back his shares at any time he desires and receive all or a portion of his investment capital in return," JA 82—in other words, it granted him a sell option that he could exercise at his discretion. USCIS repeated that reasoning in the denial letter, citing as "prohibitive" the specific language in

Section 6.01 requiring the Corporation to purchase "all of the shares in the Corporation legally or beneficially owned by the Shareholder" in the event of "the voluntary retirement of a Shareholder." JA 324. And subsequently, in its denial of Wang's appeal, USCIS "affirm[ed] the previous denial," noting that Wang "[had] still not demonstrated that the required minimum amount of capital was placed at risk for the purpose of generating a return in accordance with applicable law." JA 391.

In *Matter of Izummi*, the BIA concluded that an I-526 petitioner failed to meet the "at risk" requirement of the EB-5 regulations because his investment agreement contained a sell option permitting him to unilaterally sell his shares back to the business at a price that guaranteed him almost $300,000 in return. 22 I. & N. Dec. at 183–84. Because a portion of the petitioner's investment was "guaranteed to be returned, regardless of the success or failure of the business," the BIA concluded that that amount "would never be at risk," and, accordingly, that the petitioner failed to satisfy the EB-5 program's minimum capital requirements. *Id.* at 184. The BIA further stated that for a "[petitioner's] money truly to be at risk, [he] cannot enter into a partnership knowing that he already has a willing buyer in a certain number of years, nor can he be assured that he will receive a certain price." *Id.* at 186. Therefore, a petitioner "may not enter into any agreement granting him the right to sell his interest back to the partnership." *Id.*

Wang argues that USCIS misinterpreted *Matter of Izummi* when it denied his petition. Pl.'s Opp. at 9–10. "The principle [sic] holding in that case," he contends, is that "a petitioner's investment is sufficiently 'at risk' when he is only able to receive any value in exchange for his investment based on the financial performance of the company." *Id.* at 9. And because Section 6.01 only permits him to sell his shares at their "book value"—which would fluctuate based on

the success or failure of the investment—Wang argues that *Matter of Izummi* "provides unequivocal support that [his] investment was completely 'at risk.'" *Id.* at 10.

The Court concludes that USCIS did not misinterpret *Matter of Izummi* in denying Wang's petition.[5] As explained below, the reasoning underlying the BIA's determination in *Matter of Izummi* that the sell option in that case did not place the petitioner's capital fully "at risk" applies equally to Wang's sell option. And that reasoning is not limited, as Wang suggests, to cases in which a petitioner is guaranteed a return of a specific amount of capital regardless of the financial performance of the company. Wang points to a passage in *Matter of Izummi* stating that the petitioner failed to meet the "at risk" standard because a specific portion of his investment was guaranteed to be returned to him "regardless of the success or failure of the business." 22 I. & N. Dec. at 184. But *Matter of Izummi's* reasoning focused on the sell option itself, as opposed to the amount of capital the petitioner would be entitled to receive back if he chose to exercise it. As the BIA held:

> To enter into a redemption agreement at the time of making an "investment" evidences a preconceived intent to unburden oneself of the investment as soon as

---

[5] Wang does not assert that *Matter of Izummi* was incorrectly decided, or that it does not reflect a reasonable interpretation of the regulations at issue. *See* Pl.'s Opp. at 9–10. And as a "precedent decision" designated by DHS to be "binding" on the agency, 8 C.F.R. § 103.3(c), the Court grants *Matter of Izummi* "substantial deference" under *Auer v. Robbins*, 519 U.S. 452, 461 (1997), as an interpretation of an agency regulation, *see Mirror Lake Village v. Nielson*, 345 F. Supp. 3d 56, 63 (D.D.C. 2018) (quoting *Mellow Partners v. Comm'r of Internal Revenue Serv.*, 890 F.3d 1070, 1079 (D.C. Cir. 2018)). But the Court declines Defendants' invitation to defer to USCIS's *interpretation* of *Matter of Izummi* as reasonable under *Auer*. Dfs.' MSJ Br. at 17. USCIS's interpretation of a BIA decision that "interprets [USCIS's] own regulation, which in turn interprets the statute" does not command such deference. *Chiayu Chang v. USCIS*, 289 F. Supp. 3d 177, 186 n.10 (D.D.C. 2018) ("An interpretation of an interpretation of an interpretation must rest on its own bottom."); *see also Wang v. USCIS*, 16-cv-1963 (TNM), 2019 WL 399735, at *3 n.4 (D.D.C. Jan. 31, 2019). To the extent that USCIS's decision to deny Wang's petition involved interpreting *Matter of Izummi*, the Court defers only to the extent that its interpretation has the "power to persuade," which it does here, for the reasons explained. *Christensen v. Harris County*, 529 U.S. 576, 587 (2000) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

possible after unconditional permanent resident status is attained. This is conceptually no different from a situation in which an alien marries a U.S. citizen and states, in writing, that he will divorce her in two years. The focus here is on the green card and not on the business. . . . For the [petitioner's] money truly to be at risk, [he] cannot enter into a partnership knowing that he already has a willing buyer in a certain number of years, nor can he be assured that he will receive a certain price . . . . The [BIA] does not find that [a petitioner] may never sell back his partnership interest. Rather, the [BIA] finds that . . . [a petitioner] may not enter into any agreement granting him the right to sell his interest back to the partnership. In no event may he enter into such an agreement prior to the end of the two-year period of conditional residence. . . . The [petitioner] must go into the investment not knowing for sure if he will be able to sell his interest at all after he obtains his unconditional permanent resident status; and if he is successful in selling his interest, the sale price may be disappointingly low (or surprising high and more than what he paid).

22 I. & N. Dec. at 186–87.

To be sure, *Matter of Izummi* held that any specific amount of capital guaranteed to be returned to the petitioner through a sell option is not "at risk" for purposes of the EB-5 regulations. But more broadly, it held that a petitioner's investment is not entirely at risk if he has *any* sell option—"a willing buyer in a certain number of years"—and especially one that may be exercised before the final adjudication of his I-829 petition. *Id.* at 186 (a petitioner "may not enter into any agreement granting him the right to sell his interest back to the partnership, [and in] no event may he enter into such an agreement prior to the end of the two-year period of conditional residence"). Without question, Wang entered such an agreement here. Therefore, as USCIS concluded, his sell option eroded his capital contribution below the $1,000,000 minimum required because it was not fully "at risk." JA 83.

Wang also argues that his sell option gave him no guarantee of any capital return at all, because under Section 6.01, the price of his shares could be "positive, zero, or negative depending on whether the company's assets . . . exceed[ed] its liabilities at the time of his exit from the company." Pl.'s MSJ Br. at 17. But in *Matter of Izummi* the BIA had the occasion to

consider an arrangement in which a petitioner had a sell option that would require the repurchase of his shares at fair market value. 22 I. & N. Dec. at 185–86. Therefore, in some sense that petitioner also risked "losing all or part of his own capital in the event the fair market value of the investment ha[d] fallen at the time of repurchase." *Id.* at 186. Nonetheless, the BIA determined that the entire investment was not "at risk" because the presence of "a willing buyer in a certain number of years" caused the arrangement to resemble "nothing more than a loan"— albeit, in the event the company became worthless—"an unsecured one." *Id.*

Wang also cites two recent opinions in this district in which courts concluded that USCIS acted arbitrarily and capriciously in denying I-526 petitions. *See* Pl.'s MSJ Br. at 16–17 (citing *Doe v. USCIS*, 239 F. Supp. 3d 297 (D.D.C. 2017)); Pl.'s Notice (citing *Chang v. USCIS*, 289 F. Supp. 3d 177 (D.D.C. 2018)). But neither of them helps his cause here. In *Doe* and *Chang*, those courts addressed how *Matter of Izummi* applied to "call options," which guarantee the right of the other shareholders in the business to buy back the petitioner's interest. *See Doe*, 239 F. Supp. 3d at 301–02; *Chang*, 289 F. Supp. 3d at 180–81. And in both cases, those courts found that, contrary to USCIS's determinations, *Matter of Izummi* did not disqualify the petitioners' investments because the call options could be exercised by the *other* shareholders, not the petitioners. *See Doe*, 239 F. Supp. 3d at 307; *Chang*, 289 F. Supp. 3d at 187. In contrast, like in *Matter of Izummi,* the Agreement provided Wang a *sell* option that guaranteed *him* the right to exit the investment at any time. *See* JA 23–27. For this reason, those cases are inapposite.[6]

_____

[6] The facts here are more like those in *Mirror Lake Village v. Nielson*, in which Judge Hogan upheld USCIS's denial of an I-526 petition because the investment agreement granted the petitioner the right to "force the company to buy back their interests at the purchase price." 345 F. Supp. 3d at 59. Although the agreement in that case, unlike here, established a specific purchase price that the petitioner could take advantage of by exercising the sell option, Judge Hogan recognized more generally that *Matter of Izummi* "requires that when investors sign

For all these reasons, USCIS did not misinterpret *Matter of Izummi* in denying his petition, even though the amount he would receive if he exercised his sell option was tied to the performance of the company.

Wang presses another reason why USCIS's "at risk" determination was arbitrary and capricious: its purported misunderstanding of the term "book value." Pl.'s MSJ Br. at 12. He points to a portion of USCIS's denial letter in which it stated that, because the sell option guaranteed that Wang may sell his shares at their "book value," as opposed to "fair market value," he "made the investment with the knowledge that his shares will be worth the same amount for the life of the investment, regardless of when he intends to sell them." JA 325. And as Wang points out, under Section 6.13, the Agreement defines book value as "the value of the stock of the Corporation after deducting the sum of all the liabilities of the Corporation from the sum of all the assets and property of the Corporation." JA 27. Therefore, he asserts, book value does not reflect "a static price," but "is tied to the current financial status of the company" and is "subject to the same fluctuations in value as the company itself." Pl.'s MSJ Br. at 14. Accordingly, Wang argues, even if he were to sell his shares back to the Corporation, "the price he would receive in return would not necessarily be the amount he originally invested in exchange for the shares, but would depend on the company's property, assets, and liabilities at the time of his withdrawal." *Id.* at 15.

The Court agrees that that portion of USCIS's denial letter appears to reflect a misunderstanding of the term "book value." As noted above, under Section 6.13, the Agreement defines "book value" as the sum of the Corporation's assets and property, subtracted by its

---

investment agreements, they do not have a guaranteed way to trigger their own exit from their investments." *Id.* at 64. Wang has such a way to trigger his exit here.

liabilities. JA 27. And if Wang exercised the sell option, the share price guaranteed to him would be based on the book value of the Corporation at the time of his exit, in accordance with Section 6.11 of the Agreement. Therefore, given the fluctuating nature of corporate liabilities, assets and property, USCIS's characterization of Wang's shares as "worth the same amount for the life of the investment" appears accurate only in the sense that the price would always be set by the formula in the Agreement. But the value of those shares, of course, would change over time.

The problem for Wang, though, is that USCIS's reasoning did not hinge on its understanding of the term "book value" or on any specific price Wang would receive for his shares if he exercised his sell option. As explained above, under *Matter of Izummi*, it turned on the presence of the sell option itself.

Wang argues, to the contrary, that "USCIS articulated only one reason for its finding that [his] petition was not 'at risk' under the terms of the Agreement," Pl.'s Opp. at 13, which was its assertion that "his shares will be worth the same amount for the life of the investment," *id.* (quoting JA 325).[7] But in doing so, he mischaracterizes the record by focusing solely on two sentences in USCIS's denial letter, entirely removed from their context.

USCIS referred to "book value" in its denial of Wang's petition only *after* it thoroughly described the basis for that denial: that his sell option guaranteed him a return of a portion of his investment. JA 324–25. In that reasoning, USCIS did not mention the term "book value."

---

[7] On this basis, Wang contends that Defendants' "arguments are limited to this sole explanation for denial advanced by USCIS." Pl.'s Opp. at 13 (citing *SEC v. Chenery Corp.*, 332 U.S. 254 (1947). Wang then describes several purportedly-new arguments put forward by Defendants in support of USCIS's decision that, according to him, are barred from consideration by the Court. *See id.* at 13–16. But the Court need not address this point, as it need not consider any of these arguments in granting Defendants' motion.

Moreover, USCIS referred to "book value" only in the context of addressing Wang's argument, discussed below, that the Amended Agreement was a non-material change to his petition, and, more specifically, only in response to Wang's characterization of the Agreement as requiring the Corporation to pay him *fair market value* for his shares. JA 325. Finally, USCIS did not mention "book value," or characterize Wang's shares as being worth the same over the span of the investment, when it denied his appeal. JA 389–92. In fact, USCIS acknowledged Wang's argument that it had "erroneously" concluded that he "made the investment with the knowledge that his shares will be worth the same amount for the life of the investment," but reaffirmed that, "[i]n spite of the new evidence and arguments presented," he still had not "demonstrated that the required minimum amount of capital was placed at risk for the purpose of generating a return in accordance with applicable law." JA 390–91. On this record, and in light of *Matter of Izummi*'s reasoning discussed above, the Court cannot conclude that USCIS relied upon a misunderstanding of the term "book value" to deny Wang's petition.[8]

For all these reasons, USCIS's "at risk" determination was not arbitrary and capricious.

## 2. The "Material Change" Standard

Wang also alleges that USCIS's refusal to consider his Amended Agreement because it constituted a "material change" to his petition was arbitrary and capricious. Pl.'s MSJ Br. at 24. In the Amended Agreement, Wang added a provision stating that he could not "sell, transfer or

---

[8] For this reason, Wang's argument that USCIS failed to "consider dispositive evidence" on "the meaning of the term book value" also fails. Pl.'s MSJ Br. at 19–20. In its denial of his appeal, USCIS acknowledged that it had considered Wang's additional arguments and his submission of an affidavit by "an expert in accounting and business evaluation" on the proper valuation of "book value." JA 390. Wang's insistence that it failed to consider this evidence rests on his contention that, if it had, USCIS would have reversed its determination that his investment was not "at risk." *See* Pl.'s MSJ Br. at 20–21. But the record does not show that such evidence was "dispositive" because it did not undermine the primary rationale for USCIS's denial—that the Agreement provided Wang an option to sell his shares back to the Corporation.

assign, in any manner, all or any part of his shares in the Company, prior to receiving final adjudication of his Form I-829 Immigrant Petition."  JA 94.  At the time he submitted it, Wang informed USCIS that the new provision "does not materially change the Shareholder Agreement" and that "the further restrictions as amended are not inconsistent nor do they conflict with the existing terms of the Shareholder Agreement."  JA 86.  However, USCIS declined to consider the Amended Agreement on the basis that it "constitute[d] [a] material change because it add[ed] a restriction that was not formally (at the time of filing) written in the agreement, and d[id] so for the sole purpose of conforming to EB-5 requirements."  JA 325.

Wang now asserts that USCIS (1) "failed to provide pertinent reasoning as to why the submission constituted a 'material change,'" (2) incorrectly determined that "a change to a company's offering documents" could be a "'material' change' in any sense," and (3) prematurely made such a determination in violation of its regulations.  Pl.'s MSJ Br. at 24.  None of these arguments prove that USCIS acted arbitrarily or capriciously.

First, Wang alleges that USCIS's explanation was arbitrary and capricious because it "provide[d] no rationale as to why the clarification was a material change rather than an immaterial one."[9]  Pl.'s MSJ Br. at 27.  While the APA requires an agency to "articulate a satisfactory explanation for its action," *State Farm*, 463 U.S. at 43, the denial of a visa petition need only "be accompanied by a brief statement of the grounds for denial," 5 U.S.C. § 555(e);

---

[9] Wang also argues that USCIS's application of the "material change" standard was arbitrary and capricious because USCIS "did not base its finding of 'material change' on any statute or regulation."  *Id.* at 25–26.  He concedes, however, the USCIS relied on *Matter of Izummi*'s holding that "[a] petitioner must establish eligibility at the time of filing," and therefore "may not make material changes to a petition that has already been filed in an effort to make an apparently deficient petition conform to [USCIS] requirements."  *Id.* at 26; *see* 22 I. & N. Dec. at 175. Wang provides no reason why it was arbitrary and capricious for USCIS to rely on its precedential decision.

*see Int'l Internship Programs v. Napolitano*, 853 F. Supp. 2d 86, 96 (D.D.C. 2012).  In this

context, the burden on the agency is "minimal," *Butte County v. Hogen*, 613 F.3d 190, 194 (D.C.

Cir. 2010), and courts will "uphold a decision of less than ideal clarity if the agency's path may

be reasonably discerned," *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp. Inc. v.

Arkansas-Best Freight System*, 419 U.S. 281, 286 (1974)).

      In the denial letter, USCIS informed Wang that under *Matter of Izummi* a petitioner may

not "make material changes to a petition . . . in an effort to make an apparently deficient petition

conform to [USCIS] requirements."  JA 323 (quoting 22 I. & N. Dec. at 175).  This bar flows

from regulations requiring a petitioner to "establish that he or she is eligible for the requested

benefit at the time of filing the benefit request and must continue to be eligible through

adjudication."  *Id.* (citing 8 C.F.R. § 103.2(b)(1)).  USCIS then stated that the Amended

Agreement contained a material change because it "add[ed] a restriction that was not formally (at

the time of filing) written in the agreement, and d[id] so for the sole purpose of conforming to

EB-5 requirements."  JA 325.  That restriction, as USCIS previously noted, prohibited Wang

from exercising his sell option under Section 6.01 until the adjudication of his I-829 petition.

JA 324.  And USCIS had, before submission of the Amended Agreement, objected to Section

6.01 as inconsistent with *Matter of Izummi* because it contained a sell option that eroded the

amount of his investment that was "at risk" below the required threshold.  JA 82–83.  On this

record, USCIS's rationale can be reasonably discerned, and it easily satisfied its minimal burden

under the APA.[10]

---

[10] Wang also argues that USCIS failed "to provide a basis for differentiating among similar cases."  Pl.'s MSJ Br. at 27.  And under the authority he cites, an agency must "treat like cases alike" and if it "makes an exception in one case, then it must either make an exception in a similar case or point to a relevant distinction between the two cases," *Westar Energy, Inc. v.*

Second, Wang argues that the provision added to the Amended Agreement "was not a 'material' change in any sense because it had no effect on the actual 'risk' to which [he] was subject." Pl.'s MSJ Br. at 28. This argument merely rehashes points raised in his challenge to USCIS's determination that his investment was not "at risk." As explained above, under *Matter of Izummi*, an investment is not fully "at risk" if it is subject to a sell option that the petitioner may exercise to exit the investment and receive a portion of his capital back, especially one that can be exercised before final adjudication of his I-829 petition. *See* 22 I. & N. Dec. at 186 ("In no event may [a petitioner] enter into a redemption agreement prior to the end of the two-year period of conditional release."). Thus, because the new provision barred Wang from exercising the sell option until after final adjudication of that petition, the agency reasonably determined that the Amended Agreement "constitute[d] a material change according [to] EB-5 requirements."[11] JA 391.

Third, Wang argues that USCIS prematurely rejected his Amended Application from consideration because the agency was required to wait until its consideration of his I-829 petition before making "an *ex-post* determination as to whether [he] actually did keep his capital invested for the required 2-year period." Pl.'s MSJ Br. at 30–31. Certainly, Wang is correct that when USCIS considers an I-829 petition, it must assess whether the petitioner maintained his

---

*FERC*, 472 F.3d 1239, 1241 (D.C. Cir. 2007); *see also AFSCME Capital Area Council 26 v. FLRA*, 395 F.3d 443, 449 (D.C. Cir. 2005)). But Wang does not identify any similar cases that USCIS should have distinguished.

[11] Wang also advances an argument based on the nature of the documents at issue. He argues that because "[a] change to the terms of an offering document . . . can be made *at any time*," his amendment to the agreement could not be considered material. *Id.* at 24 (emphasis added). However, he cites to no legal authority in support, and *Matter of Izummi* appears to foreclose this argument. *See* 22 I. & N. at 175 (holding that "material changes" made to a partnership agreement could not be considered).

investment in accordance with the regulations. But that does not mean USCIS may forgo its duty to determine whether a petitioner's initial I-526 petition meets certain requirements, including showing that at the time the petition is filed, the petitioner "has placed the required amount of capital at risk" under 8 C.F.R. § 204.6(j)(2).

*            *            *

For all the above reasons, Wang has not shown that USCIS acted arbitrarily and capriciously under § 706(2)(A) of the APA when it denied his I-526 petition. Accordingly, the Court will enter summary judgment for Defendants on Count I.

**B.      Whether USCIS's Denial of Wang Petition Was *Ultra Vires* (Count II)**

In Count II, Wang alleges that USCIS exceeded its statutory authority and engaged in *ultra vires* agency action under 5 U.S.C. § 706(2)(C) when it denied his I-526 petition on the basis that his investment was not "at risk" and when it declined to consider his Amended Agreement on the ground that it constituted a "material change" to his petition. Am. Compl. ¶¶ 79–84. Because an agency's "power to act and how [it is] to act is authoritatively prescribed by Congress . . . when [it] act[s] improperly, no less than when [it] act[s] beyond [its] jurisdiction, what [it] do[es] is ultra vires." *City of Arlington, Tex. v. FCC*, 569 U.S. 290, 297 (2013). "[T]he question in every case is, simply, whether the statutory text forecloses the agency's assertion of authority, or not." *Id.* at 1871.

**1.      The "At Risk" Determination**

First, Wang contends that USCIS acted *ultra vires* of the INA when it concluded that his investment was not "at risk." Here, Wang essentially advances the same arguments raised in Count I, only fashioned as an *ultra vires* claim. Specifically, Wang alleges that USCIS exceeded the scope of the INA's term "invest" when it determined that "his investment was not 'at risk' under 8 C.F.R. § 204.6(j)(2)." Pl.'s MSJ Br. at 23. USCIS's "erroneous finding that [Wang's]

22

$1,000,000 cash investment was not 'at risk,'" he contends, is contrary to the statutory command under 8 U.S.C. § 1153(b)(5) that visas "shall be made available" to "qualified immigrants" that have "invested" in a U.S.-based commercial enterprise. *Id.* But, as explained above, USCIS determined, in accordance with its regulations and *Matter of Izummi*, that Wang's investment was not sufficiently "at risk" to qualify for the EB-5 program; that it was more like a loan than an actual investment. And Wang utterly fails to explain why the INA, and especially the term "invested" in § 1153(b)(5), forecloses this determination.

Accordingly, Wang's *ultra vires* claim against USCIS's "at risk" determination must fail.

### 2. The "Material Change" Standard

Second, Wang argues that USCIS engaged in *ultra vires* action when it declined to consider the Amended Agreement because it applied a new standard for what constitutes a "material change."

In declining to consider Wang's Amended Agreement, USCIS applied its regulation requiring a visa petitioner to "establish that he or she is eligible for the requested benefit at the time of filing the benefit request and must continue to be eligible through adjudication." JA 323 (citing 8 C.F.R. § 103.2(b)(1)). And in *Matter of Izummi*, the BIA interpreted that regulation to mean that "a petitioner may not make material changes to a petition that has already been filed in an effort to make an apparently deficient petition conform to [USCIS] requirements." 22 I. & N. Dec. at 175. In so doing, the BIA cited a previous (non-precedential) administrative decision, *Matter of Katigbak*, in which it had determined that a visa petition "was properly denied because the beneficiary was not at that time qualified," even through "at a future date . . . the beneficiary may become qualified under a new set of facts." 14 I. & N. Dec. 45, 49 (BIA 1971). USCIS cited these authorities in its letter to Wang identifying the "restriction" that "prohibit[ed] [him] from exercising Section 6.01 until the adjudication of [his] Form I-829" as a material change.

JA 323–25.  For the reasons explained in Section III(A)(2), USCIS reasonably deemed that

restriction to be a "material change" because it modified a provision of the Agreement that it had

previously advised him was objectionable under *Matter of Izummi* in a way that appeared to try

to address those concerns.

Wang argues that USCIS exceeded its statutory authority when it determined that a

change to a petition is "material" if "its 'sole purpose' was to 'conform[] to EB-5 requirements.'"

Pl.'s MSJ Br. at 33.  *Id.* (quoting JA 325).  This new standard, he argues, is "much broader" than

the established standard that a material change must be one that "render[s] an unapprovable

petition approvable."  Pl.'s MSJ Br. at 33 (citing *Matter of Katigbak*, 14 I. & N. Dec. at 49).

Wang is wrong on all counts.  For starters, the dual premises of his argument are

incorrect.  The record does not reflect that USCIS *only* considered Wang's apparent purpose in

submitting the Amended Agreement when it declined to consider it.  And the regulations and

decisions cited above do not suggest that the established standard for materiality is that any such

change must succeed in making an unapprovable petition approvable.  In fact, such a standard

makes no sense.  The whole point is that USCIS does not consider material changes to a petition

at all—thus precluding it from determining whether the change would make the petition

approvable—because such changes cannot, by definition, establish that the petitioner was

"eligible for the requested benefit at the time of filing the benefit request."  8 C.F.R.

§ 103.2(b)(1).  In any event, and more importantly, Wang does not plausibly argue that any

portion of the INA foreclosed USCIS's authority to decline to consider the Amended Agreement

on this basis, such that it acted *ultra vires*.

*          *          *

For the above reasons, the Court cannot conclude that Defendants engaged in *ultra vires* action when it determined that Wang failed to show that his investment satisfied EB-5 requirements and when it declined to consider Wang's Amended Agreement in its review of his petition. Therefore, the Court will enter summary judgment in favor of Defendants on Count II.

### C.  Whether USCIS's Application of the "Material Change" Standard to Wang's Petition Required Notice-and-Comment Rulemaking (Count IV)

For the same reasons that USCIS's application of the "material change" standard was not *ultra vires*, Wang's claims in Count IV that the application represented a "stark departure" from EB-5 regulations such that it required notice-and-comment rulemaking must fail. Compl. ¶¶ 90–93. Legislative rules are those that "have the 'force and effect of law' and may be promulgated only after public notice and comment." *Nat'l Min. Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (quoting *INS v. Chadha*, 462 U.S. 919, 986 n.19 (1983)). In determining whether an agency adopted a new legislative rule, courts look to whether the rule "effects 'a substantive regulatory change' to the statutory or regulatory regime." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 6–7 (D.C. Cir. 2011) (quoting *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 34 (D.C. Cir. 2005)). In support of his claim that the agency adopted a new legislative rule by adopting "a *de facto* amendment to its regulation through adjudication," Wang merely recites and incorporates by reference his arguments that USCIS acted outside its statutory authority by applying a new "material change" standard. Pl.'s MSJ Br. at 34–35 (citing *Marseilles Land and Water Co. v. Fed. Energy Regulatory Com'n*, 345 F.3d 916, 920 (D.C. Cir. 2003)). But, as explained above, in refusing to consider the Amended Agreement because it was a material change to Wang's petition, USCIS reasonably applied its regulations and a binding precedential decision. Wang wholly fails to demonstrate that USCIS enacted a substantive

regulatory change that would require notice-and-comment rulemaking under 5 U.S.C. § 553. Therefore, the Court will enter summary judgment in favor of Defendants on Count IV.

### D.     Whether USCIS's Denial of Wang's Petition Violated His Fifth Amendment Due Process Rights (Count III)

In Count III, Wang alleges that USCIS violated his Fifth Amendment due process rights "for the same reasons [its decision] is arbitrary and capricious." Pl.'s MSJ Br. at 39. To bring a claim under the Due Process Clause, a plaintiff must show (1) "deprivation of a protected liberty or property interest," (2) "by the government," (3) "without the process that is 'due' under the Fifth Amendment." *NB ex rel. Peacock v. District of Columbia*, 794 F.3d 31, 41 (D.C. Cir. 2015). "To succeed on a due process claim, a plaintiff must show that there was a cognizable liberty or property interest at stake." *Smirnov v. Clinton*, 806 F. Supp. 2d 1, 12 (D.D.C. 2011) (citing *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976)). Thus, the "initial inquiry" in a Due Process claim looks to whether a protected liberty or property interest has been implicated. *Raoof v. Sullivan*, 315 F. Supp. 3d 34, 44 (D.D.C. 2018) (citing *Meachum v. Fano*, 427 U.S. 215, 223 (1976)).

Wang has not shown that in denying his I-526 petition, USCIS deprived him of a protected liberty or property interest. In support of this constitutional claim, he asserts that he "possesses a valid due process interest in the proper adjudication of his visa." Pl.'s Opp. at 24. But "an applicant for initial entry has no constitutionally cognizable liberty interest in being permitted to enter the United States." *Rafeedie v. INS*, 880 F.2d 506, 520 (D.C. Cir. 1989). And "there is no property right in an immigrant visa." *Smirnov*, 806 F. Supp. 2d at 12 (citing *United State ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950)). Nor is there "a constitutionally-protected interest in the procedures by which such visas are obtained." *Id.* (citing *Legal Assistance for Vietnamese Asylum Seekers v. Dep't of State, Bureau of Consular Affairs*, 104

F.3d 1349, 1353 (D.C. Cir. 1997)).  Accordingly, the Court will enter summary judgment for Defendants on Count III.

## IV.    Conclusion

For all the above reasons, the Court will, in a separate Order, grant Defendants' Amended Cross-Motion for Summary Judgment, ECF No. 26, and deny Wang's Amended Motion for Summary Judgment, ECF No. 25.

**SO ORDERED.**

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: April 19, 2019